IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIE ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:11-CV-1122-WKW |
| | ) | (LEAD CASE) |
| CITY OF MONTGOMERY, | ) | (WO) |
| | ) | |
| Defendant. | ) | |

_____

| | | |
|---|---|---|
| WILLIE ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12-CV-523-WKW |
| | ) | (MEMBER CASE)[1] |
| CITY OF MONTGOMERY, *et al.*, | ) | (WO) |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Willie Adams complains of race-based employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Civil Rights Acts of 1866 and 1871, 42 U.S.C. §§ 1981 and 1983.  Before the court are Defendants City of Montgomery, Gail Gipson, and James Ivey's original and supplemental motions for summary judgment.  (Docs. # 33, 70.)  The motions for

---

[1] Plaintiff Willie Adams filed two suits: Case No. 2:11-cv-1122-WKW, against Defendant City of Montgomery, and Case No. 2:12-cv-523-WKW, against the City and two City employees, Defendants Gail Gipson and James Ivey.  Because the cases involve overlapping facts and claims, the court consolidated the two actions.  (Doc. # 29.)

summary judgment have been fully briefed.  (Docs. # 34, 35, 36, 37, 71, 72, 75, 76.)  After considering the parties' arguments, the relevant law, and the evidence, the court finds that Defendants' motions are due to be granted.

## I.  JURISDICTION AND VENUE

The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3).   The parties do not contest personal jurisdiction or venue.

## II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id.*  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable factfinder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir.

2001).   If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists.   *Id.* at 324.

## III.  BACKGROUND

**A.   Facts**

### 1.   *Parties, Past Claims, and Prior Litigation History*

Mr. Adams, who is black, first worked for the City from September 2003 to August 2004.   On August 10, 2007, the City re-hired Mr. Adams as a temporary employee to work on an asphalt crew.   It later hired him as a permanent employee (Service Maintenance Worker I) on February 8, 2008.   Since February 25, 2009, Mr. Adams has been employed as an Equipment Operator (truck driver), a position which requires the use of his CDL license.   His duties include driving a City dump truck and hauling equipment and materials for City concrete crews.

Mr. Ivey was formerly Mr. Adams's supervisor when Mr. Adams worked on an asphalt crew.   Mr. Ivey is now Superintendent over all asphalt crews.[2]   Ms. Gipson is the Director of the City's Maintenance Department.   She has made numerous personnel decisions at issue in this suit, including deciding whether to hire, promote, or transfer Mr. Adams and others.

---

[2] It is unclear why Mr. Ivey is a defendant in this suit.  When asked how Mr. Ivey had retaliated against Mr. Adams, Mr. Adams responded that Mr. Ivey had "nothing to do *with this case*." (Doc. # 76-1, at 10 (emphasis added).)

Before filing this suit, Mr. Adams previously has complained that the City discriminated against him on account of his race and retaliated against him for engaging in protected activity.  On the basis of alleged events in 2007 and 2008, Mr. Adams filed his first Equal Employment Opportunity Commission ("EEOC") charge in June 2008. (Doc. # 35-1, at 1.)  He later initiated a federal lawsuit in October 2010.  *See Adams v. City of Montgomery*, Case No. 2:10-cv-924-MHT. At issue in the first suit were Mr. Adams's claims that: (1) the City discriminated against him by not re-hiring him as a Service Maintenance Worker III in 2008; (2) the City discriminated against him by not hiring him as a truck driver in November 2007; (3) the City discriminated against him by reprimanding and suspending him in May, August, and September 2008; and (4) the City retaliated against him by reprimanding and suspending him and transferring him from the asphalt crew to the ditch crew in 2008.  *See Adams v. City of Montgomery*, Case No. 2:10-cv-924-MHT (M.D. Ala. Apr. 24, 2012).  Many of Mr. Adams's previous claims against the City involved Mr. Ivey's alleged discriminatory conduct, although Mr. Ivey was not a party in the first suit.  All claims raised in the first suit have been adjudicated at summary judgment or at trial in the City's favor.

The claims in the first suit are somewhat similar to but distinct from the claims asserted in this action.  Even so, the first EEOC charge and first lawsuit are

relevant here for purposes of analyzing the timing and frequency of Mr. Adams's engagement in protected activity and Defendants' allegedly retaliatory actions.

### 2.    Allegations at Issue in This Suit

On April 24, 2008, the Montgomery City County Personnel Board posted an announcement for a Construction Equipment Operator.[3] [4]    The announcement listed as a minimum qualification that applicants possess at least three years' experience operating at least three pieces of certain heavy equipment.  (Doc. # 35-10, at 8–9.)   Mr. Adams applied.   The Personnel Board requested additional information from Mr. Adams, who apparently did not respond.  It sent Mr. Adams a letter on May 23, 2008, stating that he was ineligible for the Construction Equipment Operator position because he did not meet the minimum qualification requirements.  (Doc. # 36-2, at 1.)

Five days later on May 28, 2008, Mr. Adams filed an internal complaint with the City about a different matter, alleging that Mr. Ivey discriminated against him on the basis of Mr. Adams's race.   (Doc. # 36-3.)  His first EEOC charge, alleging race discrimination, followed in June 2008.

---

[3] The Personnel Board, which is not a party, serves as the personnel department for the City and other governmental entities.   The Personnel Board posts announcements for open positions and qualifies applicants for employment.

[4] Neither complaint identifies this claim of non-promotion.  During discovery Mr. Adams identified this as a position for which the City denied him a promotion.  He identified it as "Heavy Equipment Operator."  (*See, e.g.*, Doc. # 37-4, at 9.)

On May 30, 2008, apparently unbeknownst to Mr. Adams, the City upgraded Jerome Pernell, a black male, who had substantial seniority over Mr. Adams, from Service Maintenance Worker to a Labor Foreman I position without posting an announcement for the position. (Doc. # 70, at 4.)[5]  The Personnel Board's rules permit Service Maintenance Workers to promote one classification level to Labor Foreman I or Equipment Operator positions without being certified by the Board and without the Board opening a competitive register for the position. (*See* Doc. # 34, at 20.)

On October 23, 2008, Mr. Adams wrote a letter to Ms. Gipson to inform her that he felt harassed and singled out for filing his discrimination complaint against Mr. Ivey. (Doc. # 75-9.)

In February 2009, Mr. Adams applied to the Personnel Board for a promotion to a vacant position as Labor Foreman I.  Defendants represent that the Personnel Board ranked Mr. Adams as number five of the best five applicants for the position.  The Maintenance Department selected Edward Thomas in April 2009, who tied for number three with another applicant. (*See* Doc. #36-7, at 2

---

[5] Neither complaint identifies this particular action; the City disclosed Mr. Pernell's promotion during discovery in response to Mr. Adams's allegations that the City had overlooked him for vacant Labor Foreman I or Equipment Operator positions from August 2007 through March 2009. (*See* Doc. # 70 at 1–2.)

(listing Mr. Thomas as 4th and Mr. Adams as 5th).)[6]  Defendants cite Mr. Adams's inferior experience as the reason it selected Mr. Thomas.  About the same time, however, in late February 2009, Mr. Adams was promoted to his current position as an Equipment Operator.

In February 2010, the City upgraded Gerone Hall from a Service Maintenance Worker position to Labor Foreman I, just as it had upgraded Jerome Pernell in 2008.  Defendants represent that, because Mr. Adams was already an Equipment Operator at this time in 2010, and no longer a Service Maintenance Worker, Mr. Adams could not be upgraded to a position that Mr. Hall took without the Personnel Board posting a vacancy and creating a competitive register.[7]

Mr. Adams initiated his second EEOC charge at the beginning of March 2010 (*see* Doc. # 75-10 (EEOC Intake Questionnaire received March 11, 2010)), asserting that the City denied him the promotion to Labor Foreman I "[f]or the last six months including as recent[ly] as February 8, 2010" because of his previous engagement in protected activity.  The EEOC notified the City of Mr. Adams's pending EEOC charge on March 23, 2010.  (Doc. # 75-11 at 2.)  The EEOC

---

[6] According to the complaint, Mr. Adams's present supervisor, Roger Orum reportedly told Mr. Adams, "[Y]ou know they won't let me give you the job."  (Doc. # 1, at 3 ¶ 14.)  This comment, or anything like it, is not cited as testimonial evidence in Mr. Adams's opposition brief.

[7] It is not clear how a Labor Foreman I position is a higher classification than an Equipment Operator position if both Labor Foreman I and Equipment Operator are one classification above Service Maintenance Worker.  It turns out that the answer is not important to the disposition of this case.

received Mr. Adams's official second charge on April 9, 2010.  (*See* Doc. 35-3 at 1.)   It only alleges retaliation.   (Doc. # 35-3 at 1 (indicating only "RETALIATION" and stating, "I believe I have been denied the promotion [to foreman] in retaliation for filing a previous charge against the employer").)  About the same time that Mr. Adams was making his second EEOC charge alleging retaliation, the EEOC issued its determination on his first charge on March 31, 2010, finding that it was more likely than not that the City had discriminated against Mr. Adams on the basis of race and in retaliation for complaining about discrimination.  (Doc. # 75-12, at 3.)

In September 2011, Mr. Adams applied for a different Equipment Operator position with the City when he became aware that there were two vacancies for truck drivers on the asphalt crew.  Mr. Ivey supervised Equipment Operators on the asphalt crew, and Mr. Adams has alleged in the past the Mr. Ivey discriminates against blacks.  According to the complaint, Ms. Gipson hired one white man who transferred from the Maintenance Department, and one black man, who had recently finished his six-months' probationary period and who had never complained about discrimination.  (Doc. # 1, at 3 ¶ 16; 2:12-CV-523-WKW Doc. # 1, at 5–6 ¶ 22–23.)[8]

---

[8] The race of the two men hired to these positions is not identified in the evidence.  Ms. Gipson testified that the two men that she placed in the positions were promoted one level from Service Maintenance Worker positions.  (Doc. # 75-15 at 13.)

Defendants assert that the two positions Mr. Adams sought are also equipment operator positions, like his present position, and therefore, he sought lateral transfers and not promotions.  Whether he was an equipment operator on a concrete crew or an asphalt crew, Mr. Adams would have enjoyed the same hours, pay, and general responsibilities.  The only difference is that on the asphalt crew, Mr. Adams would drive a larger tandem truck and would answer to a different superintendent – Mr. Ivey – whom Adams has alleged is racially prejudiced.  Ms. Gipson has explained that she denied Mr. Adams's request to transfer "because, if he was transferred, he would [have] be[en] supervised by James Ivey who [Mr.] Adams has alleged racially discriminated against him" in the past, (Doc. # 36-10 at 1), and because "Mr. Adams would derive no benefit from [the] transfer with no change in benefits, pay[,] or hours."  (Doc. # 75-16, at 2.)

On September 22, 2011, Mr. Adams requested that the EEOC issue a notice of right to sue on his second charge against the City.  (Doc. # 75-14, at 2 ("By e-mail dated [September 22, 2011 Mr. Adams's] attorney requested the issuance of a NRTS.").)  On September 30, 2011, at Mr. Adams's request, the EEOC issued him a "Notice of Right to Sue" letter on his second EEOC charge.  (Doc. # 35-4, at 1.)  Although Defendants represent that their copy of the notice is date stamped, no stamp is discernible on the copy furnished to the court.  (*See* Doc. # 35-4, at 1.)  An Administrative Secretary at the City's Legal Department, Eva Anthony, avers

9

in an affidavit that she received the copy of the notice on Wednesday, October 5, 2011, at 10:15 a.m.  (Doc. #76-3, at 1.)[9]

About a week earlier, "[o]n or around [Thursday,] September 29, 2011," (Doc. # 36-11, at 1), a concerned citizen called Gale Harwell, executive secretary to Deputy Mayor Jeff Downes, to report marijuana odor originating from a City truck.  Defendants claim that the citizen provided the truck's number, 5815-2405. Ms. Harwell stated at her deposition that she could not remember the number provided, but that she wrote it down as she spoke with the caller.  (Doc. # 75-18, at 5.)  Ms. Harwell forwarded the information to Chris Conway, Director of Public Works, who directed Ms. Gipson to investigate.  On Monday, October 3, 2011, Ms. Gipson directed Mr. Adams's supervisor, Mr. Orum, to travel to the truck's location to confront Mr. Adams. [10]  Mr. Adams theorizes that Ms. Gipson became aware of his intent to sue and "decided to use this anonymous complaint as a pretext for having Adams drug tested, in the hopes that he would test positive and, thereby, be terminated."  (Doc. # 75, at 32.)

Mr. Adams says that when Mr. Orum confronted him about the caller's information, Mr. Orum said that the caller identified marijuana odor emanating

---

[9] At the pretrial hearing, the court examined the original stamped document, and the date and time are correct.

[10] None of Defendants' evidence contradicts Mr. Adams's assertion that he was drug tested on Monday, October 3, 2011.  This is the same date he identified in his charge filed with the EEOC (Doc. # 35-5, at 2.)

from 5815-2407.  Mr. Adams told Mr. Orum that he drove truck number 5815-2405, not truck number 5815-2407.  (Docs. # 75-13, at 7.)  Mr. Orum asked Mr. Adams who else had been in the truck on September 29 at the time in question.  Mr. Adams told Mr. Orum that only he (Mr. Adams) and a black foreman[11] were in the truck at that time.  (Doc. # 37-2, at 1.)  At the direction of Mr. Orum and Ms. Gipson, Mr. Adams and the foreman were subjected to drug and alcohol testing including urinalysis, breathalyzer, and hair testing.  Mr. Adams insinuates that it is telling that Defendants tested Mr. Adams but not the entire crew assigned to his truck, (Doc. # 75, at 29), but Mr. Adams is the one who said that only he and the foreman were in his truck.  Mr. Adams and the foreman both passed the tests, and Defendants took no further action.

The Maintenance Department's Policy Manual provides that an employee should be screened for drugs or alcohol "[i]f there is reasonable suspicion to believe" he or she uses or is under the influence of drugs or alcohol "while working for the City."  (Doc. # 37-3, at 14.)  "Circumstances which provide a basis for determining reasonable suspicion may include . . . *[i]nformation concerning recent drug or alcohol use by the employee from a reliable and credible source*."

---

[11] Not to be confused with *Roger* Orum, the supervisor, *Arthur* Orum was the other employee with Mr. Adams in the truck.  (Doc. # 37-2, at 1.)  All references to "Mr. Orum" are references Roger Orum.

(Doc. # 37-3, at 13–14. (emphasis added).)[12]   The policy further provides that "[s]upervisors are required to specify in writing the exact facts, symptoms, and/or observations of drug or alcohol use.  Any corroboration by other sources, which formed the basis for a reasonable suspicion, must also be documented."  (Doc. # 37-3, at 14.)  Defendants have produced no "writing," as required by the Policy Manual, substantiating the suspected drug or alcohol use.  Ms. Gipson explains that this is because Mr. Orum, as Mr. Adams's supervisor, "was not the one [who] reported" the alleged drug use.  (Doc. # 75-15, at 24.)

Within days of being subjected to drug and alcohol testing, Mr. Adams filed his third EEOC charge on October 12, 2011, alleging race discrimination and retaliation.    In the charge, he complained specifically about denial of his application to promote to foreman in 2010, denial of his request to transfer to vacant truck driver positions in 2011 in spite of his seniority, and his subjection to drug and alcohol testing when other City truck drivers were not tested.  (Doc. # 35-5, at 1–2.)

---

[12] Mr. Adams neglects to cite the emphasized language and instead focuses on the absence of other circumstances like "direct observation of drug or alcohol use, presence of physical symptoms consistent with drug or alcohol use i.e. alcohol odor, slurred speech, poor coordination and/or reflexes, and abnormal or erratic behavior by the employee."  (Doc. # 75, at 29.)  There is no dispute that Mr. Adams has not been observed using drugs or alcohol at work or manifesting characteristics of a person under the influence of drugs or alcohol.

B.   **Procedural History**

On December 29, 2011, Mr. Adams filed the instant suit against the City (Civil Action No. 2:11-CV-1122-WKW), alleging race discrimination and retaliation in violation of Title VII and 42 U.S.C. §§ 1981 and 1983.  On June 20, 2012, he filed another case against the City, Ms. Gipson, and Mr. Ivey (the "Individual Defendants") (Civil Action No. 2:12-CV-523-WKW).  The complaint filed in the second suit alleges that the Individual Defendants are liable for race discrimination and retaliation in violation of §§ 1981 and 1983.  (Civil Action No. 2:12-CV-523-WKW, Doc. # 1, at 8.)  The parties jointly moved to consolidate the cases.

Defendants filed a motion for summary judgment on February 22, 2013 (Doc. # 33), along with their brief and evidence, (Docs. # 34, 35, 36, and 37).  Mr. Adams requested more time to respond, pursuant to Federal Rule of Civil Procedure 56(d), and he was granted an extension until the end of March.  He sought more time again, and the court extended the response deadline until June 5, 2013.  Then, there was a barrage of discovery motions, which the magistrate judge resolved on May 31, 2013.  The same day, the magistrate judge granted Defendants until August 1, 2013, to supplement their motion for summary judgment to address additional issues that had arisen since the filing of the original motion.  (*See* Doc. # 70, at 2.)  Defendants filed their supplemental motion and

brief.   (Docs. # 70, 71.)   After receiving another short extension of time, Mr. Adams filed his first and only response to Defendants' motions.   (Doc. # 75.) Defendants have replied.   (Doc. # 76.)

## IV. DISCUSSION

Title VII of the Civil Rights Act of 1964 prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."   42 U.S.C. § 2000e-2(a)(1).   It further prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]."   *Id.* at § 2000e-3(a).

The Civil Rights Act of 1866, or Section 1981, guarantees "all persons . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," and it also protects against race-based employment discrimination and retaliation.   The Civil Rights Act of 1871, or Section 1983, prohibits state actors from acting in violation of federal law.   "[Section] 1981 does not provide [a] cause of action against state actors; therefore, § 1983 constitutes the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981."   *Bryant v. Jones*, 575 F.3d 1281, 1288 n.1 (11th Cir. 2009).   Accordingly, Mr. Adams's

§ 1981 and § 1983 claims against Defendants "merge" into a single claim.  *Vason v. City of Montgomery, Ala.*, 240 F.3d 905, 906 n.1 (11th Cir. 2001)).

"Both [Title VII and § 1981] have the same requirements of proof and use the same analytical framework."  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  Hence, courts "need not discuss [a] plaintiff's Title VII claims separately from his section 1981 and section 1983 claims" when all claims "are based on the same set of facts."  *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

Where, as here, there is no direct evidence of unlawful race-based discrimination or retaliation, the plaintiff typically must use the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to show indirect evidence of discrimination.  *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174, 1181 (11th Cir. 2010).  Under the *McDonnell Douglas* framework, the plaintiff must first make a prima facie case of discrimination or retaliation.  He makes a prima facie case of discrimination by demonstrating that: "(1) [he] is a member of a protected group; (2) [he] was qualified for [his] position; (3) [he] suffered an adverse employment action; and (4) employment or disciplinary policies were differently applied to [him]."  *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012).  Similarly, he makes a prima facie case of retaliation under Title VII by showing that: "(1) [he] engaged in an

activity protected under Title VII; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford*, 529 F.3d at 970.[13] "[S]ummary judgment . . . is appropriate if [the plaintiff] fails to satisfy any one of the elements of a prima facie case." *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1433 (11th Cir. 1998).

But if the plaintiff makes his prima facie case of either discrimination or retaliation, "the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its actions." *Gate Gourmet*, 683 F.3d at 1255. And if the defendant proffers a nondiscriminatory reason, the burden returns to the plaintiff, who must show that the proffered reason is pretextual. *Id.* The plaintiff can demonstrate pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasoning. *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007).

## A.  <u>Exhaustion of Administrative Remedies</u>

Title VII provides that an aggrieved employee must file a charge with the EEOC before pursuing a judicial complaint. *See* 42 U.S.C. § 2000e-5(e). The

---

[13] Although Title VII discrimination claims can be supported by evidence that an employer has both lawful and discriminatory motives, "Title VII retaliation claims require proof that the employer's desire to retaliate was the but-for cause" of the plaintiff's challenged employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).

charge should contain certain information including, "[a] clear and concise statement of the facts . . . constituting the alleged unlawful employment practices." 29 C.F.R. § 1601.12.  "The scope of the employee's judicial complaint "is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 589 n.8 (11th Cir. 1994) (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970) (internal quotation marks omitted)).

Defendants contend that summary judgment should be granted in their favor on Mr. Adams's Title VII discrimination claims because Mr. Adams failed to report to the EEOC in his second and third charges of discrimination facts substantiating his allegations of race discrimination.  (Doc. # 34, at 8–9) ("[W]hile [Mr. Adams] has checked both race and retaliation on the October 2011 [c]harge . . . , the narratives of both [EEOC] charges only allege retaliation.  Moreover, neither charging instrument references a heavy equipment operator position.").)

Mr. Adams responds that his *first* EEOC charge described allegations of racial discrimination, and his second EEOC charge referenced his first charge; ergo, he could reasonably expect the EEOC to investigate continued discrimination in addition to new allegations of retaliation.  Furthermore, his third charge identifies "race" as a "cause of discrimination."  (Doc. # 35-5 at 1.)

It is true that the second and third charges do not clearly allege racially motivated discrimination where the EEOC charge form requests a narrative of "the particulars." (Docs. # 35-3, at 1; 35-5, at 1.) Rather, each charge focuses on the City's alleged retaliation for Mr. Adams's past complaints of race discrimination. However, courts should be "extremely reluctant to allow procedural technicalities to bar claims brought under Title VII," and therefore, they should interpret the scope of an EEOC charge liberally. *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (internal quotations omitted). Because it is appropriate to interpret the scope of Mr. Adams's EEOC filings liberally, and because the EEOC was already aware of potentially discriminatory actions after its investigation of Mr. Adams's first charge, the court finds the EEOC's investigation of Mr. Adams's second and third charges could reasonably include an inquiry of whether the City or its employees discriminated against Mr. Adams on the basis of his race. Hence, the court will consider the merits of Mr. Adams's Title VII discrimination claims. Even if Mr. Adams's Title VII discrimination claims were procedurally barred, the same analysis is necessary for his § 1981 discrimination claims against the Individual Defendants.[14]

---

[14] Mr. Adams does not support his § 1981 and § 1983 claims against the City with any argument that the City had a custom or policy of discrimination or retaliation.

**B.**   **Discrimination Claims Under Title VII and § 1981**

Mr. Adams has not responded to each argument raised in Defendants' motions for summary judgment.  Even so, each argument will be addressed.

### 1.   *Non-Promotion to Construction Equipment Operator in May 2008*

Defendants contend that the City could not, and therefore, did not, promote Mr. Adams to Construction Equipment Operator in May 2008 because he did not meet the minimum qualifications for the job.  *See Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir. 1988) (requiring that a plaintiff be qualified for the promotion he seeks).  Mr. Adams does not respond to Defendants' argument.  Summary judgment is due to be granted as to this claim.

### 2.   *Non-Promotion to Labor Foreman I Positions in 2008, 2009, and 2010*

Defendants argue that Mr. Adams cannot show that his non-promotion to Labor Foreman I at any time was racially discriminatory because "[a]ll persons hired" to that position "since [Mr. Adams] began his employment with the City . . . have been African American male[s]."  (Doc. # 34 at 11; Doc. # 70, at 4.)  Mr. Adams does not respond to these arguments.  In the absence of other circumstantial evidence, an employer's determination to hire or promote a candidate from the same protected class as the plaintiff prevents the plaintiff from making a prima facie case of race discrimination.  *Crawford*, 529 F.3d at 970 (requiring that the

19

plaintiff show that "[his] employer treated similarly situated employees outside [his] class more favorably"). Defendants are entitled to summary judgment on Mr. Adams's race discrimination claims based on his non-promotion to Labor Foreman I in 2008, 2009, and 2010.

### 3. *Denial of Lateral Transfer in September 2011*

Defendants assert that Ms. Gipson's refusal to transfer Mr. Adams to either of two different Equipment Operator positions in September 2011 is not actionable because the denial of a lateral transfer to a position with identical hours, pay, and benefits is not an adverse employment action. Mr. Adams responds that while it is true that the requested Equipment Operator jobs would not have involved better hours, pay, or benefits, he would have been able to drive a tandem truck and to operate other heavy equipment that was not available to him in his work on a concrete crew. He points out that Ms. Gipson admitted that allowing employees to transfer laterally often affords them with valuable training and experience operating different equipment, and this diversified experience assists in their career advancement with the City. (*See* Doc. # 75-15, at 5.)

Defendants reply that when Ms. Gipson was asked specifically about the circumstances accompanying Mr. Adams's requested transfer, rather than about lateral transfers generally, she stated that Mr. Adams would not have derived any educational or training benefits because a tandem truck is essentially the same as

the dump truck Mr. Adams operates, just larger.  (*See* Doc. # 75-15 at 9–10

("[T]here [i]s no difference in driving a small dump truck and a large dump truck,"

so Ms. Gipson decided that the lateral transfer "wasn't beneficial to [Mr. Adams's]

career development.").)  Furthermore, Defendants point out that when asked what

the benefits of driving a tandem truck are, Mr. Adams testified, "They got AC,

they got a CD player, and – let me see.  It's bigger.  And that's about it."  (*See*

Doc. # 76-1, at 5.)

Mr. Adams's own testimony substantially undercuts the argument in his

brief.  Assuming that Mr. Adams sought the lateral transfer not only for air-

conditioning, a CD player, and a bigger tandem truck, but also opportunities to

learn how to operate new kinds of equipment, there is no dispute that becoming an

Equipment Operator on the asphalt crew would not "entail an increase in pay,

prestige, or responsibility" for Mr. Adams.  *Gaddis v. Russell Corp*., 242

F. Supp. 2d 1123, 1145 (M.D. Ala. 2003) (Albritton, J.) (internal quotations

omitted).  Notably, Mr. Adams points to no evidence, other than Ms. Gipson's

testimony about why some employees aspire to transfer laterally, demonstrating

that experience driving a tandem truck on an asphalt crew would provide Mr.

Adams with greater prestige or responsibility than his position driving a dump

truck on a concrete crew.  Without an adverse employment action, Mr. Adams

cannot make his prima facie case of discrimination.  Defendants are entitled to

summary judgment on Mr. Adams's claim of discriminatory non-transfer to an equipment operator position on an asphalt crew.

### 4.    Subjection to Drug Testing

Defendants argue that Mr. Adams fails to show how his subjection to drug and alcohol testing, upon reasonable suspicion and pursuant to City policy, amounted to an adverse employment action. They further assert that Mr. Adams fails to show that Defendants have treated white employees more favorably under similar circumstances. Mr. Adams responds that the testing was unreasonably administered in violation of City policies and that it constitutes an adverse employment action.

As discussed *supra,* to make a prima facie case of race discrimination, the plaintiff must show that he suffered an adverse employment action. In the employment discrimination context, an employer's conduct that falls short of an ultimate employment decision "must, in some substantial way, alter the [plaintiff]'s compensation, terms, conditions, or privileges of employment, deprive him . . . of employment opportunities, or adversely affect his . . . status as an employee" in order to be considered adverse. *Crawford*, 529 F.3d at 970 (internal quotations and alterations omitted). An employee alleging race discrimination should also demonstrate that his employer treated similarly situated employees outside his protected class more favorably. *Holifield v. Reno*, 115 F.3d 1555, 1562

(11th Cir. 1997).  Mr. Adams does not show how his subjection to drug testing is

adverse, as Eleventh Circuit law defines adverse employment actions in the context

of a discrimination claim.  Neither does he proffer evidence of the City's failure to

drug test a non-black employee whom the City reasonably suspected of drug use

on the job.[15]  And even though a plaintiff can survive summary judgment without

producing evidence of a comparator, *see Smith v. Lockheed-Martin Corp.*, 644

F.3d 1321, 1328–29 (11th Cir. 2011), Mr. Adams does not present a "convincing

mosaic of [other] circumstantial evidence that would allow a jury to infer

intentional[, *race-based*] discrimination," *id.* at 1329, motivating Ms. Gipson or

anyone else to subject Mr. Adams to drug testing.  For these reasons, Defendants

are entitled to summary judgment on Mr. Adams's claim that they subjected him to

drug testing on account of his race.

## C.   Retaliation Claims Under Title VII and § 1981

### 1.   *Non-Promotion to Construction Equipment Operator in May 2008*

Defendants argue that Mr. Adams had not engaged in any protected activity

before May 2008, and thus, he cannot support a prima facie case of retaliation in

---

[15] Outside of the argument section of the opposition brief, Mr. Adams claims that the Defendants "subject[ed] him to a racially and retaliatory hostile environment by . . . subjecting him to an unwarranted and humiliating drug test."  (Doc. # 75, at 2.)  However, Mr. Adams has made no effort to fully develop a hostile work environment claim, which requires "proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Miller v. Kenworth of Dothan, Inc*., 277 F.3d 1269, 1275 (11th Cir. 2002) (internal quotation marks omitted).

connection with his non-promotion to Construction Equipment Operator.   Mr. Adams does not respond to Defendants' argument.   Defendants are entitled to summary judgment as to this retaliation claim.

### 2.   *Denial of Labor Foreman I Position in May 2008*

Similarly, Defendants explain that Jerome Pernell's upgrade to Labor Foreman I in May 2008 pre-dates Mr. Adams's involvement in an EEOC or judicial complaint.   Alternatively, Defendants offer a legitimate non-retaliatory reason for upgrading Mr. Pernell – his seniority.   Mr. Adams does not respond to either argument.   Defendants are entitled to summary judgment as to this retaliation claim.

### 3.   *Denial of Labor Foreman I Position in February 2009*

Defendants assert that Mr. Adams cannot meet his burden of establishing causation in his prima facie case of retaliation, as the claim pertains to his non-promotion to Labor Foreman I in 2009, and because there is no close temporal proximity between Mr. Adams's engagement in protected activity and his non-promotion to Labor Foreman I.   The City hired Edward Thomas to the position in April 2009.   Defendants point out that Mr. Adams had last engaged in protected activity in May and June of 2008.

The Eleventh Circuit has held that a Title VII plaintiff can meet the burden of proving causation "by showing close temporal proximity between the statutorily

protected activity and the adverse employment action. But mere temporal proximity, without more, must be very close. A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (internal citations and quotations omitted). Defendants calculate that Mr. Adams faces a ten- or eleven-month disparity between his engagement in protected activity and the City's decision to deny him this promotion.

Alternatively, Defendants argue that the City had a legitimate non-discriminatory reason for hiring Edward Thomas. Edward Thomas had supervisory experience, which Mr. Adams lacked, and Mr. Thomas had more extensive landscaping experience than Mr. Adams.

Mr. Adams's opposition brief mentions the denial of a promotion to Labor Foreman I in February 2009 (Doc. # 75, at 3), but he does not make any substantial argument about this claim anywhere in his brief. Defendants are entitled to summary judgment on Mr. Adams's retaliation claim as it pertains to Mr. Adams's non-promotion to Labor Foreman I in 2009.

### 4.   *Denial of Labor Foreman I Position in February 2010*

Similarly, Defendants posit that Mr. Adams cannot meet his burden to show causation as to his claim that the City denied him a promotion to Labor Foreman I in February 2010 because Mr. Adams had not engaged in statutorily protected

activity since 2008. Furthermore, Defendants proffer a legitimate, non-discriminatory reason for placing Gerone Hall in the position Mr. Adams sought. The City upgraded Mr. Hall from Service Maintenance Worker to Labor Foreman I pursuant to its policy to promote Service Maintenance Workers one classification level without action on the part of the Personnel Board to post the position, establish a competitive register, and qualify applicants.

Again, Mr. Adams does not respond to either of Defendants' arguments on this claim. Summary judgment is due to be granted to Defendants on Mr. Adams's retaliation claim as it relates to his non-promotion to Labor Foreman I in February 2010.

### 5. *Denial of Transfer to Equipment Operator Position*

Next is the City's denial of Mr. Adams's request to transfer to an asphalt crew. Defendants contend that Mr. Adams cannot show that (1) the denial of a request to transfer to a comparable job on a different crew would have dissuaded a reasonable employee from making or supporting a charge of discrimination, *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006), or (2) that the City's September 2011 denial of his requested transfer was within sufficiently close temporal proximity to his April 2010 EEOC charge, *see Thomas*, 506 F.3d at 1364. Alternatively, Defendants argue that Ms. Gipson had a legitimate non-retaliatory reason for not transferring Mr. Adams: he would derive no benefit (*i.e.*,

26

increased salary, better hours, etc.) from the transfer, and the transfer would also place Mr. Adams under the supervision of Mr. Ivey, whom Mr. Adams had accused of discrimination in the past.

Mr. Adams counters that he need not make a prima facie case of retaliation because Ms. Gipson has admitted that "she refused to transfer [him] to the Equipment Operator Positions on the asphalt crew because [of] the complaints of discrimination which [he] had lodged against James Ivey." (Doc. # 75, at 20.)  Mr. Adams misses – maybe ignores – Ms. Gipson's point and the evidence.  In both her affidavit and deposition she explained that she did not transfer Mr. Adams because (1) he would have derived no benefit from the transfer in his pay, hours, benefits, or job duties, and (2) if transferred, Mr. Adams would be working for Mr. Ivey, a supervisor whom Mr. Adams had accused of race discrimination.  (*See* Docs. # 75-16, at 2 ("[Mr. Adams] would be working for James Ivey who, in 2008, Mr. Adams alleged discriminated against him."); 75-15, at 13 ("I mean, why would you want to work under someone that you said that you thought had discriminated against [you]?"); 75-15 at 13 ("I just didn't think [Mr. Adams] would be happy working with Mr. Ivey because he felt that he had been discriminated against.  I just didn't want to put him over there, and he wasn't getting any benefits from it.").)

While the court must view the evidence in the light most favorable to Mr. Adams, it cannot view Ms. Gipson's remarks as an admission of bias or retaliatory intent without misconstruing what she said. She offered legitimate explanations for her decision to deny the transfer, including her intent to keep Mr. Adams and Mr. Ivey from potentially experiencing conflict. She does not admit to punishing Mr. Adams for complaining about Mr. Ivey in the past.

In the absence of Defendants' expressed intent to retaliate, Mr. Adams must put forward a prima facie case. Mr. Adams does not explain how the denial of his requested lateral transfer would dissuade a reasonable employee from engaging in protected activity. *See Burlington*, 548 U.S. at 57, 68. Regarding causation, he contends that "an adverse action which follows . . . an extended period of opposition . . . can be retaliatory." (Doc. # 75 at 21 (citing cases from the Third Circuit including *San Filippo v. Bongiovanni*, 30 F.3d 424 (3d Cir. 1994)).)[16] He contends that "this was the first opportunity which [Ms.] Gipson had to affect [his] working conditions, and she used it to deny him the benefit he sought." (Doc. # 75, at 22.) However, in the absence of other evidence of causation, Eleventh Circuit law requires a showing of close temporal proximity between a plaintiff's

---

[16] In *San Fillipo*, the court reasoned that "[a]lthough [an adverse action] that occurs years after protected activity might not ordinarily support an inference of retaliation, where . . . a plaintiff engages in subsequent protected activity and the plaintiff [suffers adverse action] after the final episode of such protected activity, a fact-finder may reasonably infer that it was the aggregate of the protected activities that led to retaliatory dismissal." 30 F.3d at 444.

engagement in protected activity and an adverse employment action.  Mr. Adams does not meet that standard.

Assuming for the sake of argument that Mr. Adams could prove a prima facie case of retaliation, the burden shifts to Defendants to produce a legitimate non-discriminatory reason for not transferring Mr. Adams to the asphalt crew.  As discussed *supra*, Ms. Gipson has proffered two reasons.  Mr. Adams asserts that one reason is pretextual and "simply not believable."  (Doc. # 75, at 26 (asserting that Ms. Gipson testified that lateral transfers can be beneficial to employees in contradiction to her testimony that Mr. Adams's requested lateral transfer would not have been beneficial to him).)  It is Mr. Adams's burden to address each of Ms. Gipson's proffered non-retaliatory reasons "head on and rebut [them]."  *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) ("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut *each* of the reasons to survive a motion for summary judgment." (emphasis added)).  Mr. Adams fails to show how Ms. Gipson's proffered non-retaliatory explanation – that she sought to keep Mr. Adams from working with Mr. Ivey, for Mr. Adams's own good – is implausible, inconsistent, or incredible.

Thus, Mr. Adams fails to make a prima facie case of retaliation as to his non-transfer to an asphalt crew equipment operator position.  Assuming that he could make the prima facie case, he fails to rebut as pretext each of Defendants'

legitimate non-discriminatory reasons for not transferring him. Consequently, Defendants are entitled to summary judgment on this claim of retaliation.

### 6.    *Subjection to Drug Testing*

Finally, Defendants argue that they are entitled to summary judgment on Mr. Adams's retaliation claim as it relates to his subjection to drug and alcohol testing. To make a prima facie case of retaliation Mr. Adams needs to show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) the adverse action was causally connected to his protected activity. *Crawford*, 529 F.3d at 970. Defendants do not dispute that Mr. Adams's most temporally proximate protected activity (initiating contact with the EEOC to request the issuance of a notice of right to sue letter) constitutes engagement in protected expression. (*See* Doc. #76, at 9.) Instead, Defendants contend that drug testing Mr. Adams pursuant to official policy and based on reasonable suspicion is not an adverse employment action. And further, they assert that, like Mr. Adams's other retaliation allegations, there is no proof of close temporal proximity to his engagement in protected activity. According to Defendants, they were unaware on October 3, 2011, that Mr. Adams had requested a notice of right to sue letter. To their knowledge, his most recent engagement in protected activity was about eighteen months earlier in 2010.

30

### a.   Adverse Action

The Supreme Court has explained in *Burlington* that Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." 548 U.S. at 67. "Adverse employment actions" are interpreted more broadly in the retaliation context than in the discrimination context. *Id.* at 61–63. Mr. Adams "must show that a reasonable employee would have found [his being subjected to drug testing] materially adverse, which in this context means it well might have dissuaded [him] from making or supporting a charge of discrimination." *Id.* at 68 (internal quotations omitted). Although the "reasonable person" standard is meant to be objective, the Supreme Court advised that "the significance of any given act of retaliation will often depend upon the particular circumstances. *Context matters*. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships." *Id.* at 69 (emphasis added). The Eleventh Circuit has commented that "*Burlington* . . . strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered materially adverse to him and thus constitute adverse employment actions." *Crawford*, 529 F.3d at 973 n.13 (internal quotations omitted).

Although submitting to drug and alcohol screening is, for some employees, a non-offensive and expected part of a job, being singled out and accused of using drugs or alcohol on the job is not a typical, petty, or trivial workplace experience. A reasonable employee would take offense at being suspected of drug use if he is innocent, and more significantly, he might feel anxiety about the employer's action when there was little or no reason to suspect drug use. He would likely worry that his employer was looking for an excuse to terminate his employment or otherwise discipline him. Additionally, considering the context of Mr. Adams's situation (*i.e.*, Mr. Adams's history of administrative and judicial complaints of discrimination and retaliation against the City), which *Burlington* advises is important, *see* 548 U.S. at 69, there is a genuine issue of material fact as to whether a reasonable employee in Mr. Adams's shoes would be dissuaded from making or supporting a charge against his employer if the employer subjected him to drug and alcohol testing without a good reason.

Of course, in this instance, Mr. Adams was not dissuaded. He filed his third EEOC charge nine days after his subjection to testing. But that does not mean that a reasonable employee would not have been dissuaded from reporting his employer's unlawful conduct. It is not for the court at summary judgment to conclude that Mr. Adams's subjection to drug and alcohol testing was "materially

adverse to him." *Crawford*, 529 F.3d at 973 n.13.[17]   Mr. Adams satisfies the adverse employment action element of his prima face case of retaliatory drug testing.

### b.   Causation

The Eleventh Circuit "has interpreted the causal link requirement broadly; a plaintiff merely has to prove that [his] protected activity and the [adverse] employment action are not completely unrelated." *EEOC v. Reichhold Chems., Inc.*, 988 F.2d 1564, 1571–72 (11th Cir. 1993).  Yet, "[a]t a minimum, a plaintiff must generally establish" through direct or circumstantial evidence "that the employer was actually aware of the protected expression at the time it took adverse employment action." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999); *see also Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 717 (11th Cir. 2002) (requiring that plaintiff show "the *decision-makers* were aware" (emphasis added)); 1 BARBARA T. LINDEMANN ET AL., EMPLOYMENT DISCRIMINATION LAW 15-50–15-51 (5th ed. 2012) ("An employee cannot establish

---

[17] Mr. Adams focuses on *Bryant v. Johnny Kynard Logging, Inc.*, ___ F. Supp. 2d ____, 2013 WL 979032 (N.D. Ala. Mar. 8, 2013), in support of his contention that attempts or threats to frame an employee with a false drug charge is legally sufficient to meet the adverse employment action requirement in the discrimination context.  *Bryant* is factually distinct.  There, the plaintiff alleged that his employer retaliated against him by terminating his employment and "trying to frame him with a false drug charge." *Id.* at ____, *13.  In determining whether summary judgment was appropriate on the plaintiff's Title VII and § 1981 retaliation claims, the court found that questions of material fact remained as to whether the plaintiff's employer's allegation that plaintiff was selling drugs and the employer's directive to the police to watch plaintiff constituted adverse employment action. *Id.* at ____, *21.  Accusing an employee of selling drugs and reporting him to law enforcement for the same is much different than subjecting an employee to drug testing.

retaliation without proving that the employer *knew* that the employee engaged in protected activity.  Without knowledge, there can be no retaliatory intent, and thus there can be no causal connection.").  Assuming that the plaintiff establishes his employer's awareness, a Plaintiff can meet his causation burden by showing close temporal proximity between his engagement in protected activity and the employer's adverse action, "[b]ut mere temporal proximity, without more, must be very close."  *Thomas*, 506 F.3d at 1364 (internal quotation marks omitted).

Even though the temporal proximity between his engagement in protected activity and the drug testing is "very close,"[18] Mr. Adams can only speculate that Ms. Gipson or anyone else in authority at the City knew on October 3 that he requested a right to sue letter on September 22 or that the EEOC issued a right to sue letter on September 30.   And Defendants have contradicted Mr. Adams's theory by putting forward evidence that the City Attorney's Office first received the EEOC's notice at 10:15 a.m. on October 5, 2011.  (Doc. # 35-4, at 1 (copy of City's original receipt date stamped October 5, 2011.)[19]   "[T]emporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct."  *Brungart v. BellSouth Telecomms.,*

---

[18] Mr. Adams requested the issuance of a notice of right to sue letter on September 22, the EEOC issued the letter on September 30, and Defendants drug tested him on October 3.

[19] *See supra* note 9.

*Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).  *Cf. McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (reasoning that where a supervisor never refuted plaintiff's evidence that the supervisor received a copy of plaintiff's written grievance, plaintiff satisfied the causation element by showing a five day gap between the submission of her grievance and her supervisor's adverse employment action against her).

Defendants have thus demonstrated that there is no genuine dispute that they lacked awareness of Mr. Adams's September 2011 request for the issuance of a notice of right to sue letter, and Mr. Adams has not rebutted their evidence. Because Mr. Adams fails to establish a prima facie case of retaliation, Defendants are entitled to summary judgment on his claim of retaliatory drug and alcohol testing in October 2011.[20]

---

[20] Although Mr. Adams cites *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) generally for its holding that a plaintiff may survive summary judgment without satisfying the requirements of *McDonnell Douglas* (*see* Doc. # 75, at 15–16), Mr. Adams does not specifically apply *Smith* in his brief to show how other circumstantial evidence suggests that Defendants intentionally retaliated against him by subjecting him to drug testing.  Mr. Adams does point out numerous facts that make Defendants' actions look suspect – for example, that Mr. Adams was subjected to drug testing on the basis of a nameless citizen's report, that Ms. Gipson delayed associating him with the report, that Mr. Orum allegedly blundered the reported truck's number when confronting Mr. Adams, and that Defendants failed to document in writing, per their policy, the reasonableness of their suspicion of Mr. Adams.  But these facts do not support an inference that Defendants knew Mr. Adams had recently participated in statutorily protected conduct.  Without evidence of Defendants' knowledge, Mr. Adams cannot show that they had him drug tested "because" he engaged in protected activity.  42 U.S.C. § 2000e-3(a).

## V.  CONCLUSION

At the pretrial conference, the court informed the parties that one claim would probably go forward, that is, the retaliation claim arising out of drug testing. In view of the original date stamp on the City's copy of the right to sue letter, the court has concluded that no claim survives summary judgment.  For the foregoing reasons, it is ORDERED that Defendants' Motions for Summary Judgment (Docs. #  33, 70) are GRANTED.  All of Mr. Adams's Title VII and § 1981 and § 1983 discrimination and retaliation claims against all Defendants are DISMISSED.

A separate final judgment will be issued.

DONE this 27th day of September, 2013.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE